ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com
       – and –
DARREN J. ROBBINS (168593)
DANIELLE S. MYERS (259916)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNESTINE BENNETT, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>         vs.<br><br>FACEBOOK, INC., MARK ZUCKERBERG, DAVID M. WEHNER and SHERYL K. SANDBERG,<br><br>                              Defendants.<br>_____ | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br>DEMAND FOR JURY TRIAL |

1    Plaintiff Ernestine Bennett, individually and on behalf of all others similarly situated, by

2    plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff

3    and plaintiff's own acts, and upon information and belief as to all other matters based on the

4    investigation conducted by and through plaintiff's attorneys, which included, among other things, a

5    review of Securities and Exchange Commission ("SEC") filings by Facebook, Inc. ("Facebook" or

6    the "Company"), Company press releases and conference call transcripts, and media and analyst

7    reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the

8    allegations set forth herein after a reasonable opportunity for discovery.

9                              **SUMMARY OF THE ACTION**

10    1.    This is a securities fraud class action on behalf of all persons who purchased

11    Facebook common stock between July 6, 2017 and March 23, 2018, inclusive (the "Class Period"),

12    against Facebook and certain of its officers and/or directors for violations of the Securities Exchange

13    Act of 1934 ("1934 Act"), including Mark Zuckerberg ("Zuckerberg"), the Company's Chief

14    Executive Officer ("CEO"), Sheryl K. Sandberg ("Sandberg"), the Company's Chief Operating

15    Officer ("COO"), and David M. Wehner, the Company's Chief Financial Officer ("CFO").  Plaintiff

16    alleges that defendants violated the federal securities laws by disseminating materially false and

17    misleading statements and/or concealing material adverse facts regarding Facebook's business and

18    operations.

19                            **INTRODUCTION AND OVERVIEW**

20    2.    Facebook is the world's largest social networking company.  The Company offers a

21    number of products and platforms that enable users to connect, share, discover and communicate

22    with each other, by far the biggest and most important of which is the Facebook platform itself.

23    Users can access these products and platforms in a number of ways, including via websites and

24    mobile applications.  Facebook's revenues were $40.6 billion, $27.6 billion and $17.9 billion in the

25    fiscal years ended December 31, 2017, 2016 and 2015, respectively.[1]

26    _____

27    [1]    The Company operates on a fiscal year ending December 31.  As used herein "FY" means
Facebook's fiscal year and "Q" means Facebook's fiscal quarter.  Thus, FY17 means Facebook's
fiscal year 2017, which runs from January 1, 2017 to December 31, 2017.  Likewise, 4Q17 means

28    Facebook's fourth fiscal quarter of 2017, which ran from October 1, 2017 to December 31, 2017.

3.       According to the Company's most recent Form 10-K, Facebook generates substantially all of its revenue from selling advertising placements to marketers.  For example, Facebook reported $40.6 billion in revenue for FY17, $39.94 billion of which was derived from ad revenue.

4.       The size of Facebook's more than two billion member user base and its users' level of engagement are critical to Facebook's success.  According to the Company's most recent Form 10-K, Facebook's financial performance, in particular, has been and will continue to be significantly determined by its success in adding, retaining and engaging active users of its products, particularly for Facebook and Instagram.  As of December 31, 2017, Facebook reported 1.4 billion daily active users and 2.13 billion monthly active users.

5.       As part of its strategy to increase its user base and its users' level of engagement, and in turn make its platform more attractive to potential advertisers and other fee-based partnerships, Facebook partners with and enables developers to build social applications on Facebook and to integrate their websites with Facebook.  As one former Facebook employee recently explained, Facebook took a 30% cut in payments made through Facebook applications (or "apps") and, in return, allowed app developers to have access to a trove of Facebook user data.  The employee elaborated that the Company was keen to encourage more developers to build apps for its platform, and "'one of the main ways to get developers interested in building apps was through offering them access to this data.'"

6.       Facebook's ability to attract both developers and marketers was driven by defendants' possession of the data of billions of Facebook users.  As explained by one analyst:

• Facebook's business model relies on its high traffic, but its real "moat" is its exclusive control over a vast array of very detailed user data that allows micro-targeting advertising.

                          *          *          *

• Almost the entirety of Facebook's revenue stream comes from advertising and in particular the draw and premium it charges because of its enormous data store.

                          *          *          *

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 2 -

Facebook currently derives about all of its revenue from advertising, in which advertisers not only choose the platform for its sheer traffic but also because of the extremely detailed data that Facebook is constantly collecting about its billions of users.

7.     Facebook's business model and its focus on monetizing the trust users placed in Facebook by selling users' data to marketers and developers has gotten Facebook into trouble with regulators and law enforcement around the world.  In 2011, the Federal Trade Commission ("FTC") charged Facebook with numerous violations of the Federal Trade Commission Act for, among other things, sharing users' data without their consent.  The FTC's November 29, 2011 press release announcing the (at that time proposed) settlement agreement described Facebook's violations and the terms of the consent decree as follows:

> The social networking service Facebook has agreed to settle Federal Trade Commission charges that it deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public.  The proposed settlement requires Facebook to take several steps to make sure it lives up to its promises in the future, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information is shared beyond the privacy settings they have established.

> *       *       *

> The FTC complaint lists a number of instances in which Facebook allegedly made promises that it did not keep:

> *       *       *

- Facebook represented that third-party apps that users' [sic] installed would have access ***only to user information that they needed to operate.  In fact, the apps could access nearly all of users' personal data – data the apps didn't need***.

- Facebook told users they could restrict sharing of data to limited audiences – for example with "Friends Only."  In fact, selecting "Friends Only" did not prevent their information from being shared with third-party applications their friends used.

- Facebook had a "Verified Apps" program & claimed it certified the security of participating apps.  It didn't.

- Facebook promised users that it would not share their personal information with advertisers.  It did.

- Facebook claimed that when users deactivated or deleted their accounts, their photos and videos would be inaccessible.  But Facebook allowed access to the content, even after users had deactivated or deleted their accounts.

- Facebook claimed that it complied with the U.S. EU Safe Harbor Framework that governs data transfer between the U.S. and the European Union.  It didn't.

The proposed settlement bars Facebook from making any further deceptive privacy claims, requires that the company get consumers' approval before it changes the way it shares their data, and requires that it obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years. [2]

8.      The press release discussed the proposed settlement with Facebook under which Facebook would be:

- barred from making misrepresentations about the privacy or security of consumers' personal information;

- required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

- required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

- required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

- required, *within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order*, and to ensure that the privacy of consumers' information is protected.

9.      Facebook formally agreed to settle the charges and enter a consent decree with the FTC on August 10, 2012.

10.     On December 11, 2015, *The Guardian* published an article titled "Ted Cruz using firm that harvested data on millions of unwitting Facebook users."  *The Guardian* stated that "surreptitious, commodified Facebook data" was being used in political campaigns and "represented an intensified collision of billionaire financing and digital targeting on the campaign trail."  In fact,

---

[2]     All emphasis in the complaint is added, unless otherwise noted.

*The Guardian* had already determined how an academic from Cambridge had combined with billionaire financier Robert Mercer ("Mercer") and others to create what turned out to be a series of overlapping companies, the best known of which is now Cambridge Analytica – *The New York Times* would later describe this as a "shell" structure (¶90) – that planned to use Facebook data to create psychological profiles for the purpose of designing political campaigns and advertisements. As explained in the *Guardian* article:

> ***Documents seen by the Guardian have uncovered longstanding ethical and privacy issues*** about the way academics hoovered up personal data by accessing a vast set of US Facebook profiles, in order to build sophisticated models of users' personalities without their knowledge.

> \*        \*        \*

> Documents seen by the Guardian show Cambridge Analytica's parent, a London-based company called Strategic Communications Laboratories (SCL), was first introduced to the concept of using social media data to model human personality traits in early 2014 by Dr Aleksandr Kogan, a lecturer at Cambridge University's renowned psychology department.

> \*        \*        \*

> The academic used Amazon's crowdsourcing marketplace Mechanical Turk (MTurk) to access a large pool of Facebook profiles, hoovering up tens of thousands of individuals' demographic data – names, locations, birthdays, genders – as well as their Facebook "likes", which offer a range of personal insights.

> \*        \*        \*

> Crucially, Kogan also captured the same data for each person's unwitting friends.  For every individual recruited on MTurk, he harvested information about their friends, meaning the dataset ballooned significantly in size.  Research shows that in 2014, Facebook users had an average of around 340 friends.

> \*        \*        \*

> By summer 2014, Kogan's company had created an expansive and powerful dataset.  His business partner boasted on LinkedIn that their private outfit, Global Science Research (GSR), "owns a massive data pool of 40+ million individuals across the United States – for each of whom we have generated detailed characteristic and trait profiles".

> Documents show SCL agreed to a contract with GSR, whereby it would pay its data collection costs in order to improve "match rates" against SCL's existing datasets or to enhance GSR's algorithm's "national capacity to profile capacity of American citizens".

11.     The article further reported that Facebook was aware of *The Guardian*'s report and declared that the Company was taking action:

After this article was published, Facebook said the company was "*carefully investigating this situation*" regarding the Cruz campaign.

"[M]isleading people or *misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data*," a Facebook spokesman said in a statement to the Guardian.

12. Defendants sought to distance themselves from their own failures raised by *The Guardian*'s reporting and assured investors in their filings with the SEC that Facebook only "provide[s] limited information to such third parties based on the scope of services provided to us." Defendants also published a white paper on April 27, 2017, which they maintained on Facebook's website, promising to "notify our users . . . if we assess they are at increased risk of future account compromise" and to provide "[p]roactive notifications to people who have yet to be targeted, but whom we believe may be as risk." Defendants reinforced these commitments by making statements during investor conference calls and on the Company's website stating, for example "your privacy is very important to us"; "we respect local laws and regulations [and take] steps . . . to protect privacy"; and "[t]hat's why as we have discovered information, we have continually come forward to share it publicly."

13. Throughout and prior to the Class Period, defendants made materially false and misleading statements and/or failed to disclose material information to investors regarding Facebook's business and operations, including that: (i) Facebook was actively and effectively protecting users' privacy and data and not sharing its users' data without their consent; (ii) Facebook was carefully investigating Cambridge Analytica's possession of user data and would take "swift action" against companies that violated Facebook's policies; and (iii) Facebook was complying with its consent decree with the FTC.

14. The Class Period misrepresentations made by defendants concerning the Company's sharing of its users' data and compliance with its consent decree with the FTC were each materially false and misleading when made and caused the Company's stock to trade at artificially inflated prices of as high as $193 per share. The true facts, which each of the defendants knew or deliberately disregarded, were:

1        (a)    That defendants failed to notify users that their user data had been improperly

2  shared with Cambridge Analytica and entities affiliated with Cambridge Analytica;

3        (b)    That Facebook user data had been shared and used for purposes and in ways

4  that violated Facebook's terms of use;

5        (c)    That Facebook user data had not been maintained in accordance with

6  Facebook's terms of use and that Facebook had not taken steps to adequately ensure that the

7  improperly shared data was destroyed; and

8        (d)    That Facebook may have been in violation of its consent decree with the FTC,

9  including by sharing the data of 50 million or more users with Cambridge Analytica and affiliated

10  entities, and by making misrepresentations concerning the fact that Facebook had shared the data and

11  defendants' efforts to verify the privacy and security of users' data.

12       15.    On Friday, March 16, 2018, defendants announced on their website that they were

13  suspending Cambridge Analytica, its parent, Strategic Communication Laboratories ("SCL"), and

14  whistleblower Chris Wylie ("Wylie") from the Facebook site for sharing Facebook's users' data

15  without the users', or Facebook's, consent.  In the post, Facebook misleadingly claimed to be the

16  victim of fraud.  The publication claimed that "Several days ago, we received reports that, contrary

17  to the certifications we were given, not all [of the improperly shared/obtained] data was deleted." In

18  fact, the reports that Facebook had "received" "[s]everal days ago" were from *The*

19  *Observer/Guardian*[3] and *The New York Times*, which notified defendants on Monday, March 12,

20  2018, that the two media organizations, working in conjunction, planned to publish articles

21  following up on the 2015 *Guardian* story concerning Cambridge Analytica's use of Facebook users'

22  data.  As it turned out, Facebook had made the March 16, 2018 disclosure late enough to avoid the

23  weekly news cycle, but still in time to preempt the negative stories by *The Guardian* and *The New*

24  *York Times* that defendants knew were going to be published on Saturday, March 17, 2018.

25

26  [3]   *The Guardian*, published Monday through Saturday, and *The Observer*, published on Sunday,

27  are owned by the same parent company and the names for each are often used interchangeably.  Both
contributed, either in collaboration or as a single entity, research and reporting central to the

28  allegations in this complaint.

16.     Tellingly, in response, defendants went so far as to threaten to sue the two media organizations.  On March 17, 2018, one of the journalists who wrote the *Guardian* article tweeted a link to the article, along with the message "Yesterday @facebook threatened to sue us."[4]

17.     The next day, on Saturday, March 17, 2018, *The Observer* and *The New York Times* each published their articles on Cambridge Analytica's use of Facebook's data.  The articles, based in large part on Wylie's whistleblower account, were a bombshell, which included a "dossier of evidence" that included "emails, invoices, contracts and bank transfers."  They revealed, among other things, that 50 million or more Facebook accounts had their data shared with Cambridge Analytica for improper political purposes without their explicit permission, far more than previously thought; that the data had not been destroyed, or even protected with encryption; and that Facebook knew this and had not acted.  Indeed, the one action defendants claim to have taken – asking the parties involved to certify destruction of the data – did not happen until August 2016, long after defendants were alerted by *The Guardian* in 2015 to the fact and nature of the improper sharing of users' data.  *The New York Times* further reported that Cambridge Analytica was "effectively a shell" for its foreign parent – an apparent attempt to avoid violating American election laws.

18.     On March 18, 2018, *The New York Times* reported that U.S. Senator Mark Warner and U.S. Representative Adam Schiff were calling for an investigation of the Facebook data leak, while U.S. Senator Amy Klobuchar of Minnesota had pressed Zuckerberg to appear before the Senate Judiciary Committee to explain what the social network knew about the misuse of its data "'to target political advertising and manipulate voters.'"  Similarly, Damian Collins, a Conservative lawmaker in Britain who is leading a parliamentary inquiry into fake news and Russian meddling in the country's referendum to leave the European Union, said that he, too, would call on Zuckerberg or another top executive to testify.  Massachusetts Attorney General Maura Healey also announced that Massachusetts had launched an investigation, while California Attorney General Xavier Becerra

---

[4]     *See* https://twitter.com/carolecadwalla/status/974995682124804099; *see also* https://twitter.com/carolecadwalla/status/976875625746194433?s=03 ("Dear Mark Zuckerberg, you offered interviews to lots of outlets but not the @guardian & Observer. We broke the story first in 2015.  We led the reporting last weekend.  You used legal threats to try and stop us.  And now, you're . . . ignoring us? #WheresZuck").

1   expressed his concern (while refusing to confirm or deny the existence of an investigation, per

2   California DOJ policy).

3            19.   On Sunday, March 18, 2018, Wylie tweeted that he had been "***Suspended by***

4   ***@facebook.  For blowing the whistle.  On something they have known privately for 2 years***."

5            20.   On March 19, 2018, in the wake of the news concerning Cambridge Analytica,

6   *Business Insider* reported that "People are furious, and they have good reason to be: Data from over

7   50 million Facebook users was used to target voters and influence the 2016 US presidential election,

8   as well as the 2016 'Brexit' referendum, reports revealed over the weekend. As a result, people are

9   deleting their Facebook accounts en masse . . . ."  On the same day, *The New York Times* reported

10  that, based on the accounts of seven Facebook insiders, the Company's Chief Information Security

11  Officer, Alex Stamos, who had "advocated more disclosure around Russian interference" on

12  Facebook, was being pushed out quietly, because "executives thought his departure would look bad"

13  after he had clashed with top executives, including Sheryl Sandberg, over such policies.  *CNN* and

14  others found the disclosures "alarming" and predicted they would likely have a negative effect on the

15  Company's entire business model.

16           21.   Another article published on March 19, 2018, this one by *WCCFTech*, reported that

17  Facebook faced billions or even trillions of dollars in liability for violating a previous consent decree

18  with the FTC, and that "The FTC consent decree required Facebook to notify users and explicitly

19  receive their permission before data is shared beyond their privacy settings.  In this case, the

20  developer only received permission from those who took the test, not their friends.  ***Facebook first***

21  ***learned of this incident back in 2015, however, [it] chose not to inform the agency or the affected***

22  ***users***."

23           22.   On March 19, 2018, as the investing public digested the disclosures over the

24  weekend, the price of Facebook common stock plummeted, closing down more than $12 per share,

25  or nearly 7%, from its close of $185.09 per share on Friday, March 16, 2018, to close at $172.56 per

26  share on Monday, March 19, 2018, on unusually high volume of more than 88 million shares traded.

27           23.   Then on Tuesday, March 20, 2018, media sources confirmed that the FTC was

28  investigating whether Facebook had violated the consent decree, and reporters were quick to

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 9 -

1   recognize that the number of affected users multiplied by possible fines meant that Facebook was

2   exposed to a trillion dollars or more in fines.  This announcement came on the top of calls for the

3   investigation of Facebook and for Zuckerberg to testify before Congress.  As the technology news

4   site, *TechCrunch*, summed it up: "Congress is mad."  British authorities issued similar calls for

5   investigation and sworn testimony of and from Facebook and its executives.

6         24.    In addition, *The Guardian* published on March 20, 2018, an update to their previous

7   story, this one based on the whistleblower evidence of a former Facebook employee, titled "'Utterly

8   horrifying': ex-Facebook insider says covert data harvesting was routine."  The *Guardian* article

9   warned the public that Cambridge Analytica might just be the tip of the iceberg because Facebook

10   routinely shared data without consent, had "'no idea what developers were doing with the data,'"

11   "did not use its enforcement mechanisms" to remedy known violations, and that the whistleblower

12   had "warned senior executives at the company," but that "'Facebook was in a stronger legal position

13   if it didn't know about the abuse that was happening. . . .  They felt that it was better not to know.'"

14         25.    Journalists and financial analysts also weighed in to stress that Facebook's entire

15   financial and operating model was newly under threat, whatever the consequences of any

16   investigations, because the scandal implicated the Company's choice to sacrifice users' privacy and

17   security by selling their data to marketers and developers.  As *CNN* concluded, citing internal

18   sources, "The Cambridge Analytica scandal has done immense damage to the [Facebook] brand,

19   sources across the company believe.  It will now take a Herculean effort to restore public trust in

20   Facebook's commitment to privacy and data protection . . . ."

21         26.    On March 20, 2018, *Bloomberg* also published an article on the fallout, reporting that

22   "New York State Attorney General Eric Schneiderman announced on Tuesday that he and

23   Massachusetts Attorney General Maura Healey had sent a demand letter to Facebook as part of a

24   joint probe stemming from the fallout. Connecticut Attorney General George Jepsen announced his

25   own probe Monday."  The article also reported that more congresspersons had expressed interest in

26   investigating Facebook.

27

28

27.     On March 20, 2018, *MarketWatch* published an article titled "Zuckerberg saved tens of millions of dollars by selling Facebook stock ahead of Monday's decline."   As the article explained:

> Facebook Inc. Chief Executive Mark Zuckerberg saw his net worth decline by more than $5 billion since Monday, but it could have been worse.
>
> Ahead of Facebook's worst one-day decline since 2012, prompted by news that data affecting 51.3 million members was improperly shared with a political consulting firm, Zuckerberg had been busy selling stock.  So far this year, he has sold more than 5 million shares.
>
> Disposing of those Facebook shares before Tuesday ended up saving about $70 million, according to Securities and Exchange Commission filings and some arithmetic by MarketWatch.

28.     On March 21, 2018, after receiving significant criticism for the scandal of improperly sharing (selling) user data, the failure to properly address the issue, and the "silence" Facebook executives had maintained since Friday, March 16, 2018, Zuckerberg finally issued a statement (on his personal Facebook page) and gave a number of interviews.  Zuckerberg finally admitted in the interviews that *The Guardian* and *The New York Times* reporting was "credible," and that Facebook needed to do a "full forensic audit" of every developer on the platform in 2014, which would necessarily include "investigating and reviewing tens of thousands of apps" and would cost "millions of dollars," which he conceded was "a pretty big deal."

29.     Sandberg also broke her silence on March 21, 2018, including by posting to her personal Facebook page, stating: "We know that this was a major violation of people's trust, and I deeply regret that we didn't do enough to deal with it. We have a responsibility to protect your data . . . ."

30.     Then on Monday, March 26, 2018, the FTC issued a press release confirming that it was investigating Facebook's privacy practices and compliance with the consent decree:

> "The FTC is firmly and fully committed to using all of its tools to protect the privacy of consumers. Foremost among these tools is enforcement action against companies that fail to honor their privacy promises, including to comply with Privacy Shield, or that engage in unfair acts that cause substantial injury to consumers in violation of the FTC Act. Companies who have settled previous FTC actions must also comply with FTC order provisions imposing privacy and data security requirements. Accordingly, the FTC takes very seriously recent press reports raising substantial concerns about the privacy practices of Facebook. Today, the FTC is confirming that it has an open non-public investigation into these practices."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                             - 11 -

1    31.    In reaction to this news, Facebook's stock price fell as much as 6.5% to $149.02 per

2    share before closing at $160.06 per share, on unusually high volume of more than 122 million shares

3    traded.

4                                **JURISDICTION AND VENUE**

5    32.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

6    Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder

7    by the SEC.

8    33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

9    §1331 and §27 of the 1934 Act.

10   34.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

11   §1391(b).  Facebook maintains its headquarters in Menlo Park, California, and many of the acts

12   charged herein, including the preparation and dissemination of materially false and misleading

13   information, occurred in substantial part in this District.

14   35.    In connection with the acts alleged in this complaint, defendants, directly or

15   indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

16   the mails, interstate telephone communications and the facilities of the national securities markets.

17                                  **THE PARTIES**

18   36.    Plaintiff Ernestine Bennett purchased Facebook common stock during the Class

19   Period as set forth in the attached certification and was damaged thereby.

20   37.    Defendant Facebook is a Delaware corporation with its principal place of business

21   located at 1601 Willow Road, Menlo Park, California 94025.  Facebook's common stock is traded

22   under the ticker "FB" on the NASDAQ Global Select Market ("NASDAQ"), an efficient market.

23   38.    Defendant Zuckerberg founded Facebook in 2003.  Defendant Zuckerberg is, and at

24   all relevant times was, CEO and Chairman of the Board of Facebook.

25   39.    Defendant Sandberg is, and at all relevant times was, COO of Facebook.

26   40.    Defendant Wehner is, and at all relevant times was, CFO of Facebook.

27   41.    Defendants Zuckerberg, Sandberg and Wehner are collectively referred to herein as

28   the "Individual Defendants."   The Individual Defendants made, or caused to be made, false

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 12

1   statements that caused the price of Facebook common stock to be artificially inflated during the

2   Class Period.

3   **CONTROL PERSONS**

4   42.   As officers and controlling persons of a publicly held company whose common stock

5   was and is traded on the NASDAQ and is governed by the provisions of the federal securities laws,

6   the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

7   with respect to the Company's financial condition, performance, growth, operations, financial

8   statements, business, markets, management, earnings and present and future business prospects and

9   to correct any previously issued statements that had become materially misleading or untrue, so that

10  the market price of the Company's common stock would be based upon truthful and accurate

11  information.  The Individual Defendants' misrepresentations and omissions during the Class Period

12  violated these specific requirements and obligations.

13  43.   The Individual Defendants participated in the drafting, preparation and/or approval of

14  the various public, shareholder and investor reports and other communications complained of herein

15  and were aware of, or recklessly disregarded, the misstatements contained therein and omissions

16  therefrom, and were aware of their materially false and misleading nature.  Because of their Board

17  membership and/or executive and managerial positions with Facebook, each of the Individual

18  Defendants had access to the adverse undisclosed information about the Company's financial

19  condition and performance as particularized herein and knew (or recklessly disregarded) that these

20  adverse facts rendered the positive representations made by or about Facebook and its business or

21  adopted by the Company materially false and misleading.

22  44.   The Individual Defendants, because of their positions of control and authority as

23  officers and/or directors of the Company, were able to and did control the content of the various SEC

24  filings, press releases and other public statements pertaining to the Company issued during the Class

25  Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be

26  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

27  their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

28

1   responsible for the accuracy of the public reports and releases detailed herein and is therefore

2   primarily liable for the representations contained therein.

3       45.    The Company and the Individual Defendants are liable for: (i) making false

4   statements; or (ii) failing to disclose adverse facts known to them about Facebook.  Defendants'

5   scheme and course of business that operated as a fraud or deceit on purchasers of Facebook common

6   stock was a success, as it: (i) deceived the investing public regarding Facebook's prospects and

7   business; (ii) artificially inflated the price of Facebook common stock; and (iii) caused plaintiff and

8   other members of the Class (as defined below) to purchase Facebook common stock at artificially

9   inflated prices.

10   **BACKGROUND TO THE CLASS PERIOD**

11       46.    Facebook has long faced criticism for failing to protect users' privacy, and indeed, for

12   creating a business model that necessarily relies on monetizing violations of users' privacy and trust.

13   *Business Insider*, for example, in a May 13, 2010 article, reported that "[s]ince Facebook launched,

14   the company has faced one privacy flap after another, usually following changes to the privacy

15   policy or new product releases. . . .  [T]he frequent changes to the privacy policy[], ha[ve] been

16   consistently aggressive: Do something first, then see how people react."  As reproduced by *Business*

17   *Insider*, an exchange Zuckerberg had with a friend during Facebook's formative phase was

18   consistent with Zuckerberg's "own views of privacy" and relevant to understanding Facebook's

19   "aggressive attitude toward privacy":

20       Zuck:  Yeah so if you ever need info about anyone at Harvard

21       Zuck:  Just ask.

22       Zuck:  I have over 4,000 emails, pictures, addresses, SNS

23       [Redacted Friend's Name]:  What?  How'd you manage that one?

24       Zuck:  People just submitted it.

25       Zuck:  I don't know why.

26       Zuck:  They "trust me"

27       Zuck:  Dumb fucks.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 14 -

1    47.    On November 29, 2011, the FTC announced that Facebook had agreed to settle

2    charges brought by the commission and enter into a consent decree following the Company's

3    repeated non-consensual sharing of users' data.   The FTC and Facebook formally agreed to

4    settlement on August 10, 2012.  The November 29, 2011 press release announcing the settlement

5    agreement described Facebook's violations and the terms of the consent decree as follows:

6         The social networking service Facebook has agreed to settle Federal Trade
          Commission charges that it deceived consumers by telling them they could keep their
7         information on Facebook private, and then repeatedly allowing it to be shared and
          made public.  The proposed settlement requires Facebook to take several steps to
8         make sure it lives up to its promises in the future, including giving consumers clear
          and prominent notice and obtaining consumers' express consent before their
9         information is shared beyond the privacy settings they have established.

10                                    *          *          *

11        The FTC complaint lists a number of instances in which Facebook allegedly
          made promises that it did not keep:
12
                                      *          *          *
13

14   •    Facebook represented that third-party apps that users' [sic] installed would
          have access **only to user information that they needed to operate.  In fact,
15        the apps could access nearly all of users' personal data – data the apps
          didn't need**.
16
     •    Facebook told users they could restrict sharing of data to limited audiences –
17        for example with "Friends Only."  In fact, selecting "Friends Only" did not
          prevent their information from being shared with third-party applications
18        their friends used.

19   •    Facebook had a "Verified Apps" program & claimed it certified the security
          of participating apps.  It didn't.
20

21   •    Facebook promised users that it would not share their personal information
          with advertisers.  It did.
22

23   •    Facebook claimed that when users deactivated or deleted their accounts, their
          photos and videos would be inaccessible.  But Facebook allowed access to
24        the content, even after users had deactivated or deleted their accounts.

25   •    Facebook claimed that it complied with the U.S.- EU Safe Harbor
          Framework that governs data transfer between the U.S. and the European
26        Union.  It didn't.

27        The proposed settlement bars Facebook from making any further deceptive
          privacy claims, requires that the company get consumers' approval before it changes
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 15 -

the way it shares their data, and requires that it obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years.

Specifically, under the proposed settlement, Facebook is:

- barred from making misrepresentations about the privacy or security of consumers' personal information;

- required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

- required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

- required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

- required, **within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order**, and to ensure that the privacy of consumers' information is protected.

48. On January 31, 2014, Facebook filed its annual report on Form 10-K with the SEC for FY13. That annual report reflected defendants' purported commitment to protecting users' data and complying with regulatory obligations. It included the following statements under the "Our Strategy" section of the filing, all of which have been removed from every subsequent Facebook filing with the SEC:

**Building and Maintaining User Trust**

Trust is a cornerstone of our business. **We dedicate significant resources to the goal of building user trust through developing and implementing programs designed to protect user privacy, promote a safe environment, and assure the security of user data**. . . .

- **Privacy and Sharing**. People come to Facebook to connect and share with different audiences. Protecting user privacy is an important part of our product development process. **Our objective is to give users choice over what they share and with whom they share it**. This effort is fundamental to our business and focuses on control, transparency, and accountability.

\*       \*       \*

- ***Transparency***. ***Our Data Use Policy describes in plain language our data use practices and how privacy works on Facebook***. We also offer a number of tools and features that provide users with transparency about their information on Facebook. Our application settings feature enables users to view each of the applications they have chosen to use, the information needed by each application, and the audience with whom the user has chosen to share his or her interactions with each application. We believe that this transparency enables people to make more informed decisions about their activities on Facebook.

- ***Accountability***. We continue to build new procedural safeguards as part of our comprehensive privacy program. . . . We regularly work with online privacy and safety experts and regulators around the world. In August 2012, the Federal Trade Commission formally approved a 20-year settlement agreement requiring us to enhance our privacy program and to complete biennial third-party assessments. We also have undergone two audits by the Office of the Irish Data Protection Commissioner. The audits comprehensively reviewed our compliance with Irish data protection law, which is grounded in European data protection principles. As part of the audit process, we agreed to enhance various data protection and privacy practices to ensure compliance with the law and adherence to industry best practices.

49.     It is against this background that, on April 30, 2014, Facebook published on its website changes to privacy settings, claiming to allow its users to manage their settings on what third parties could see and share. According to Facebook's announcement, "we've heard from people that they're often surprised when a friend shares their information with an app. So we've updated Facebook Login ***so that each person decides what information they want to share about themselves, including their friend list***."[5]

50.     On December 11, 2015, *The Guardian* published an article titled "Ted Cruz using firm that harvested data on millions of unwitting Facebook users." *The Guardian* stated that it was "report[ing] here for the first time" that "surreptitious, commodified Facebook data" was being used in political campaigns and "represented an intensified collision of billionaire financing and digital targeting on the campaign trail." In fact, *The Guardian* had already determined how an academic

---

[5]   *See* https://developers.facebook.com/blog/post/2014/04/30/the-new-facebook-login.

1   from Cambridge had combined with billionaire financier Mercer and others to create what turned out

2   to be a series of overlapping companies, the best known of which is now Cambridge Analytica – *The*

3   *New York Times* would later describe this as a "shell" structure (¶90) – that planned to use Facebook

4   data to create psychological profiles for the purpose of designing political campaigns and

5   advertisements.  As explained in the article:

> Documents seen by the Guardian have uncovered longstanding ethical and privacy issues about the way academics hoovered up personal data by accessing a vast set of US Facebook profiles, in order to build sophisticated models of users' personalities without their knowledge.

> *          *          *

> Documents seen by the Guardian show Cambridge Analytica's parent, a London-based company called Strategic Communications Laboratories (SCL), was first introduced to the concept of using social media data to model human personality traits in early 2014 by Dr Aleksandr Kogan, a lecturer at Cambridge University's renowned psychology department.

> *          *          *

> The academic used Amazon's crowdsourcing marketplace Mechanical Turk (MTurk) to access a large pool of Facebook profiles, hoovering up tens of thousands of individuals' demographic data – names, locations, birthdays, genders – as well as their Facebook "likes", which offer a range of personal insights.

> *          *          *

> Crucially, Kogan also captured the same data for each person's unwitting friends. For every individual recruited on MTurk, he harvested information about their friends, meaning the dataset ballooned significantly in size.  Research shows that in 2014, Facebook users had an average of around 340 friends.

> *          *          *

> By summer 2014, Kogan's company had created an expansive and powerful dataset. His business partner boasted on LinkedIn that their private outfit, Global Science Research (GSR), "owns a massive data pool of 40+ million individuals across the United States – for each of whom we have generated detailed characteristic and trait profiles".

> Documents show SCL agreed to a contract with GSR, whereby it would pay its data collection costs in order to improve "match rates" against SCL's existing datasets or to enhance GSR's algorithm's "national capacity to profile capacity of American citizens".

26      51.     The article further reported that Facebook was aware of *The Guardian*'s report and

27   declared that the Company was taking action:

28

After this article was published, Facebook said the company was "***carefully investigating this situation***" regarding the Cruz campaign.

"[M]isleading people or ***misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data***," a Facebook spokesman said in a statement to the Guardian.

52.    Defendants responded to the *Guardian* article, according to emails obtained from *Business Insider*, by contacting Cambridge Analytica to ask them the following:

"Here are the articles I saw yesterday in addition to The Guardian. Please let me know (1) where there are inaccuracies and (2) whether I can share your PR contact's info with our PR team (for the purpose of sharing that contact info with any media outlet who contacts us)?" . . . .

53.    In addition to doing business with Cambridge Analytica, beginning in 2014, Facebook hired Joseph Chancellor, a co-founding director with Aleksandr Kogan ("Kogan") of Global Science Research ("GSR"), as a quantitative social psychologist.  Facebook hired Chancellor in or around November 2015, and as of March 2018 he was still working at Facebook's Menlo Park headquarters.  According to *The Guardian*, "The Guardian asked Facebook several questions about its recruitment of Chancellor and any action it had taken in light of the data harvesting scam conducted by GSR.  Facebook initially promised to respond to a set of questions by Sunday, but then said it had nothing to say on the matter."

54.    On February 3, 2017, defendants filed with the SEC Facebook's annual report on Form 10-K for FY16.  In addition to reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016, the Form 10-K purported to warn investors that Facebook's partners and customers, including marketers and developers, might access, use or share Facebook's users' data in improper ways.  But the Form 10-K also assured investors that Facebook meaningfully limited the information it shared with third parties "based on the scope of services provided to us," rather than based on the amount third parties paid defendants for Facebook users' data:

Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business.

*        *        *

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 19 -

1
2
3
4

[S]ome of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook. **We provide limited information to such third parties based on the scope of services provided to us**. However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

5   55.   The FY16 Form 10-K also contained certifications pursuant to the Sarbanes-Oxley

6   Act of 2002 ("SOX") signed by defendants Zuckerberg and Wehner stating that the information

7   contained in the Form 10-K "fairly present[s] in all material respects the financial condition [and]

8   results of operations . . . of the [Company] as of, and for, the periods presented in this report."

9   56.   On March 30, 2017, *The Intercept* followed up on the 2015 *Guardian* report about

10  Cambridge Analytica's involvement with the Cruz campaign with an article titled "Facebook Failed

11  to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate." *The*

12  *Intercept* reported a number of new details, including:

13
14
15
16
17

Shortly after The Guardian published its 2015 article, Facebook **contacted Global Science Research and requested that it delete the data it had taken from Facebook users**. Facebook's policies give Facebook the right to delete data gathered by any app deemed to be "negatively impacting the Platform." The company believes that Kogan and SCL complied with the request, which was made during the Republican primary, before Cambridge Analytica switched over from Ted Cruz's campaign to Donald Trump's. It remains unclear what was ultimately done with the Facebook data, or whether any models or algorithms derived from it wound up being used by the Trump campaign.

18
19
20

In public, Facebook continues to maintain that whatever happened during the run-up to the election was business as usual. "**Our investigation to date has not uncovered anything that suggests wrongdoing**," a Facebook spokesperson told The Intercept.

21  57.   On April 27, 2017, Facebook published a white paper, titled "Information Operations

22  and Facebook," that "outlined [Facebook's] understanding of organized attempts to misuse our

23  platform."[6]  The white paper promised readers that "**We notify our users with context around the**

24  **status of their account and actionable recommendations if we assess they are at increased risk of**

25  **future account compromise by sophisticated actors or when we have confirmed their accounts**

26  **have been compromised**," and that Facebook provided "[p]roactive notifications to people who have

27  yet to be targeted, but whom we believe may be as risk."

28  ---

[6]   *See* https://newsroom.fb.com/news/2017/09/information-operations-update/.

1    58.    On May 3, 2017, Facebook issued a press release announcing the Company's 1Q17

2   results and also held a conference call for analysts, media representatives and investors to discuss

3   those results.  The call was hosted by Zuckerberg, Sandberg and Wehner.  During the call they

4   repeated the financial results in the press release issued that same day and made further false and

5   misleading statements concerning the Company's safeguarding of users' data and privacy and the

6   Company's ability to monetize the trust users placed in Facebook:

7               [Sandberg:]   We think that targeting and measurement are significant
                competitive advantages for us.  We're very focused on the privacy of what people do,
8               wherever they do it and using the information we have in a very responsible way.
                We believe that because people are sharing interests, because people are themselves
9               their real identity on the Facebook platform, we have a significant advantage.

10   59.    On May 4, 2017, defendants filed with the SEC Facebook's quarterly report on Form

11   10-Q for 1Q17.  In addition to reporting the Company's financial and operating results for the

12   quarter ended March 31, 2017, the Form 10-Q contained the same purported risk disclosures and

13   false and misleading statements and omissions concerning Facebook's sharing of user data with third

14   party marketers and developers, including:

15               Security breaches and **_improper access to or disclosure of our data or user data_**, or
                other hacking and phishing attacks on our systems, **_could harm our reputation and_**
16               **_adversely affect our business_**.

17                                          *        *        *

18               [S]ome of our developers or other partners, such as those that help us measure the
                effectiveness of ads, may receive or store information provided by us or by our users
19               through mobile or web applications integrated with Facebook.  **_We provide limited_**
                **_information to such third parties based on the scope of services provided to us_**.
20               However, **_if_** these third parties or developers fail to adopt or adhere to adequate data
                security practices, or in the event of a breach of their networks, our data or our users'
21               data may be improperly accessed, used, or disclosed.

22   60.    The 1Q17 Form 10-Q also contained SOX certifications signed by defendants

23   Zuckerberg and Wehner stating that the information contained in the Form 10-Q "fairly present[s] in

24   all material respects the financial condition [and] results of operations . . . of the [Company] as of,

25   and for, the periods presented in this report."

26   61.    Spokespersons for Facebook also frequently responded to inquiries concerning

27   possible violations of the terms posted to the Company's website by emphasizing that "misleading

28   people or misusing their information is a direct violation of our policies" and that "**_we will take swift_**

1    ***action against companies that do***, including banning those companies from Facebook and requiring

2    them to destroy all improperly collected data."  For example, the following publications all report

3    receiving this precise message from Facebook:

4         •    *The Guardian*, "Ted Cruz using firm that harvested data on millions of unwitting

5              Facebook users" (Dec. 11, 2015).

6         •    *ITPro*, "Ted Cruz entangled in Facebook data-grabbing scandal" (Dec. 14, 2015).

7         •    *BuzzFeed News*, "The Truth About The Trump Data Team That People Are Freaking

          Out About" (Feb. 16, 2017).

8
          •    *Newsweek*, "How Big Data Mines Personal Info to Craft Fake News and Manipulate

9              Voters" (June 8, 2017).

10                        **FALSE AND MISLEADING STATEMENTS ISSUED**
                              **DURING THE CLASS PERIOD**
11

12        62.    On July 6, 2017, and throughout the Class Period, defendants continued to maintain

13   on Facebook's website that "***We notify our users with context around the status of their account***

14   ***and actionable recommendations if we assess they are at increased risk of future account***

15   ***compromise by sophisticated actors or when we have confirmed their accounts have been***

16   ***compromised***," and that Facebook provided "[p]roactive notifications to people who have yet to be

17   targeted, but whom we believe may be as risk."

18        63.    On July 26, 2017, Facebook issued a release announcing the Company's 2Q17 results

19   and also held a conference call for analysts, media representatives and investors to discuss those

20   results.  The call was hosted by Zuckerberg, Sandberg and Wehner.  During the call they repeated

21   the financial results in the release issued that same day, announced that Facebook now had 2 billion

22   monthly active users, and made further false and misleading statements concerning the Company's

23   compliance with legal obligations and the safeguarding of its users' data, including:

24             [Zuckerberg:]  We're proud of the progress we're making, and it also comes
          with a responsibility to make sure that we have the most positive impact on the world
25        that we can.

26                                  *      *      *

27             [Sandberg:]  Well, when we think about any regulatory issues, GDPR or
          anything else, ***we respect local laws and regulations***, and we have to work really
28        closely with regulators to make sure they understand our business practices,
          understand how we contribute to economic growth in their countries and understand

*the steps we take and continue to take to protect privacy*.  Certainly, regulation is always an area of focus that we work hard *to make sure that we are explaining our business clearly and making sure regulators know the steps we take to protect privacy as well as making sure that we're in compliance*.

64.     On July 27, 2017, defendants filed with the SEC Facebook's Report on Form 10-Q for 2Q17.  In addition to reporting the Company's financial and operating results for the quarter ended June 30, 2017, the 2Q17 Form 10-Q contained the following purported risk disclosures and false and misleading statements concerning Facebook's sharing of user data with third-party marketers and developers:

Security breaches and *improper access to or disclosure of our data or user data*, or other hacking and phishing attacks on our systems, *could harm our reputation and adversely affect our business*.

\*          \*          \*

[S]ome of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook.  *We provide limited information to such third parties based on the scope of services provided to us*.  However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

65.     The 2Q17 Form 10-Q also contained SOX certifications signed by Zuckerberg and Wehner stating that the information contained in the Form 10-Q "fairly present[s] in all material respects the financial condition [and] results of operations . . . of the [Company] as of, and for, the periods presented in this report."

66.     Throughout the Class Period, defendants also falsely emphasized Facebook's commitment to protect users' privacy and comply with regulations and other responsibilities.  Facebook's website, for example, maintained a Terms of Service page[7] affirmatively assuring users that "[y]our privacy is very important to us," and referred users to the Company's Data Policy page,[8] which in turn advised users that third parties operating on or with Facebook "must adhere to strict confidentiality obligations in a way that is consistent with this Data Policy and the agreements we enter into with them."

---

[7]  *See* https://m.facebook.com/terms.

[8]  *See* https://m.facebook.com/about/privacy/.

67.     Following Facebook's July 26 and 27, 2017 release, conference call and Form 10-Q filing, the price of Facebook common stock traded at artificially inflated prices of more than $172.00 per share.

68.     On September 6, 2017, Facebook posted to its website "An Update On Information Operations On Facebook."  The post cited the white paper published in April 2017, which falsely stated the following concerning information shared with users:

> *We notify our users with context around the status of their account and actionable recommendations if we assess they are at increased risk of future account compromise by sophisticated actors or when we have confirmed their accounts have been compromised*.

69.     On October 11, 2017, Facebook posted to its website video of an *Axios* interview of Sandberg, in which Sandberg stated, *inter alia*, that Facebook *followed up on* "*every lead it had*" *concerning improper use of its platform*.

70.     The misrepresentations in ¶¶62-66 and 68-69 above concerning the Company's sharing of users' data and Facebook's compliance with its consent decree with the FTC were each materially false and misleading when made.  The true facts, which were then known to or deliberately disregarded by defendants, included:

(a)     That defendants failed to notify users that their user data had been improperly shared with Cambridge Analytica and entities affiliated with Cambridge Analytica;

(b)     That Facebook user data had been shared and used for purposes and in ways that violated Facebook's terms of use;

(c)     That Facebook user data had not been maintained in accordance with Facebook's terms of use and that Facebook had not taken steps to adequately ensure that the improperly shared data was destroyed; and

(d)     That Facebook may have been in violation of its consent decree with the FTC, including by sharing the data of 50 million or more users with Cambridge Analytica and affiliated entities, and by making misrepresentations concerning the fact that Facebook had shared the data and defendants' efforts to verify the privacy and security of users' data.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                   - 24 -

1     71.     On November 1, 2017, Facebook issued a release announcing the Company's 3Q17

2   results.  In the release, Zuckerberg assured investors: "'We're serious about preventing abuse on our

3   platforms.  We're investing so much in security that it will impact our profitability.'"  Zuckerberg

4   emphasized that "'[p]rotecting our community is more important than maximizing our profits.'"

5     72.     On November 1, 2017, defendants also held a conference call for analysts, media

6   representatives and investors to discuss those results.  The call was hosted by Zuckerberg, Sandberg

7   and Wehner.  During the call they claimed they were doing everything they could to address threats

8   to the security and integrity of their platform and were not limiting themselves only to Russian

9   propaganda or interference in elections:

10          [Zuckerberg:]  But none of that [user growth] matters if our services are used
            in a way that doesn't bring people closer together or the foundation of our society is
11          undermined by foreign interference.  I've expressed how upset I am that the Russians
            tried to use our tools to sow mistrust.  We built these tools to help people connect and
12          to bring us closer together, and they used them to try to undermine our values.  What
            they did is wrong, and *we are not going to stand for it*.

13                                    *          *          *

14          This is part of a much bigger focus on protecting the security and integrity of
15          our platform and the safety of our community.  *It goes beyond elections*, and it
            means strengthening all of our systems *to prevent abuse* and harmful content.

16                                    *          *          *

17          *I am dead serious about this*.  And the reason I'm talking about this on our earnings
18          call is that I've directed our teams to invest so much in security on top of the other
            investments we're making that it will significantly impact our profitability going
19          forward.  *And I wanted our investors to hear that directly from me.*  I believe this
            will make our society stronger and, in doing so, will be good for all of us over the
20          long term.  But I want to be clear about what our priority is: *protecting our
            community is more important than maximizing our profit*.

21                                    *          *          *

22
            [Sandberg:]  I want to close by talking about what we're doing to protect our
23          platform and help ensure that the ads and content people see on Facebook and
            Instagram are legitimate and authentic.  When I was in Washington a few weeks ago,
24          I made clear that *we are determined to do everything we can do to minimize abuse
            going forward*.

25                                    *          *          *

26
            *Transparency helps keep – helps everyone keep advertisers accountable for
27          their messages*.

28                                    *          *          *

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 25 -

Because *the interference on our platform went beyond ads*, *we're also increasing transparency around organic content from pages*.

73. Following Facebook's November 1, 2017 release and conference call, the price of Facebook common stock closed at $182.66 per share.

74. On November 2, 2017, defendants filed with the SEC Facebook's 3Q17 report on Form 10-Q. In addition to reporting the Company's financial and operating results for the quarter ended September 30, 2017, the Form 10-Q contained the same purported risk disclosures and false and misleading statements and omissions concerning Facebook's sharing of user data with third-party marketers and developers, including:

Security breaches and *improper access to or disclosure of our data or user data*, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business.

\*     \*     \*

[S]ome of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook. *We provide limited information to such third parties based on the scope of services provided to us*. However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

75. The 3Q17 Form 10-Q also contained SOX certifications signed by Zuckerberg and Wehner stating that the information contained in the Form 10-Q "fairly present[s] in all material respects the financial condition [and] results of operations . . . of the [Company] as of, and for, the periods presented in this report."

76. On November 22, 2017, Facebook posted a notice to its website, titled "Continuing Transparency on Russian Activity," which falsely stated that Facebook had disclosed, and continued to publicly disclose, improper uses of the Company's platform:

A few weeks ago, we shared our plans to increase the transparency of advertising on Facebook. This is part of our ongoing effort to protect our platforms and the people who use them from bad actors who try to undermine our democracy.

\*     \*     \*

It is important that people understand how foreign actors tried to sow division and mistrust using Facebook before and after the 2016 US election. *That's why as we have discovered information, we have continually come forward to share it publicly* and have provided it to congressional investigators.

77.     On January 31, 2018, Facebook issued a release announcing the Company's FY17 and 4Q17 results and also held a conference call for analysts, media representatives and investors to discuss those results.  The call was hosted by Zuckerberg, Sandberg and Wehner.  During the call Zuckerberg said that addressing abuses of Facebook's platform was his "personal challenge for 2018."

78.     On February 1, 2018, defendants filed with the SEC Facebook's annual report on Form 10-K for FY17.  In addition to reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2017, the Form 10-K contained the same purported risk disclosures and false and misleading statements and omissions concerning Facebook's sharing of user data with third-party marketers and developers, including:

> Security breaches and **_improper access to or disclosure of our data or user data_**, or other hacking and phishing attacks on our systems, **_could harm our reputation and adversely affect our business_**.
>
> *          *          *
>
> [S]ome of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook.  **_We provide limited information to such third parties based on the scope of services provided to us_**. However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

79.     The FY17 Form 10-K also contained SOX certifications signed by Zuckerberg and Wehner stating that the information contained in the Form 10-K "fairly present[s] in all material respects the financial condition [and] results of operations . . . of the [Company] as of, and for, the periods presented in this report."

80.     On February 28, 2018, Sandberg and Wehner appeared at the Morgan Stanley Technology, Media & Telecom Conference, during which they made further false and misleading statements reassuring investors that they were actively preventing the abuses of their platform:

> [Sandberg:]  We are taking a number of steps to show that **_we take full responsibility for everything that happens on our platform_** . . . .  So a couple of things we're very focused on.  False news.  People want real news on Facebook. . . .  **_And so probably the most important thing we can do is go after the economic incentives and make sure that people who are purveying fake/false news are not making money from it. And we've done that in a very big way_**.

81.     After February 28, 2018, Facebook stock continued to trade at artificially inflated prices of more than $180.00 per share.

82.     The misrepresentations in ¶¶71-72 and 74-80 above concerning the Company's sharing of users' data and Facebook's compliance with its consent decree with the FTC were each materially false and misleading when made.   The true facts, which were then known to or deliberately disregarded by defendants, included:

(a)     That defendants failed to notify users that their user data had been improperly shared with Cambridge Analytica and entities affiliated with Cambridge Analytica;

(b)     That Facebook user data had been shared and used for purposes and in ways that violated Facebook's terms of use;

(c)     That Facebook user data had not been maintained in accordance with Facebook's terms of use and that Facebook had not taken steps to adequately ensure that the improperly shared data was destroyed; and

(d)     That Facebook may have been in violation of its consent decree with the FTC, including by sharing the data of 50 million or more users with Cambridge Analytica and affiliated entities, and by making misrepresentations concerning the fact that Facebook had shared the data and defendants' efforts to verify the privacy and security of users' data.

## THE TRUTH FACTS BEGIN TO BE DISCLOSED

83.     On Monday, March 12, 2018, *The Observer* contacted Facebook for comment on a story it was researching with *The New York Times* concerning Facebook's sharing of users' data with Cambridge Analytica.

84.     On Friday, March 16, 2018, in after-trading hours, the Company's Deputy General Counsel posted a notice to Facebook's website titled "Suspending Cambridge Analytica and SCL Group from Facebook" (the "Notice").   The Notice admitted that Facebook had learned in *2015* that there had been unauthorized transmission of Facebook user data to Cambridge Analytica and that the University of Cambridge professor, Dr. Aleksandr Kogan, had lied to the Company about how Cambridge Analytica intended to use the user data to which it had been given access:

We are suspending Strategic Communication Laboratories (SCL), including their political data analytics firm, Cambridge Analytica, from Facebook.  Given the public prominence of this organization, we want to take a moment to explain how we came to this decision and why.

**We Maintain Strict Standards and Policies**

***Protecting people's information is at the heart of everything we do***, and we require the same from people who operate apps on Facebook.  In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan lied to us and violated our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica, a firm that does political, government and military work around the globe.  He also passed that data to Christopher Wylie of Eunoia Technologies, Inc.

Like all app developers, Kogan requested and gained access to information from people after they chose to download his app.  His app, "thisisyourdigitallife," offered a personality prediction, and billed itself on Facebook as "a research app used by psychologists."  Approximately 270,000 people downloaded the app.  In so doing, they gave their consent for Kogan to access information such as the city they set on their profile, or content they had liked, as well as more limited information about friends who had their privacy settings set to allow it.

Although Kogan gained access to this information in a legitimate way and through the proper channels that governed all developers on Facebook at that time, he did not subsequently abide by our rules.  By passing information on to a third party, including SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies, he violated our platform policies.  ***When we learned of this violation in 2015, we removed his app from Facebook and demanded certifications*** from Kogan and all parties he had given data to that the information had been destroyed.  Cambridge Analytica, Kogan and Wylie all certified to us that they destroyed the data.

**Breaking the Rules Leads to Suspension**

Several days ago, we received reports that, contrary to the certifications we were given, not all data was deleted. . . .

We are committed to vigorously enforcing our policies to protect people's information.  We will take whatever steps are required to see that this happens.  We will take legal action if necessary to hold them responsible and accountable for any unlawful behavior.

85.   On March 17, 2018, *The Guardian* published an article titled "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach."  The *Guardian* article reported that Wylie,[9] acting as a whistleblower, had provided both documents and his own account of what had happened, and reported that GSR had received funding from Russian sources:

---

[9]   In a separate March 18, 2018 article, this one a profile of Wylie, *The Guardian* described Wylie's sources and motivation as follows: "Wylie has the paper trail . . . he had the receipts, invoices, emails, legal letters – records that showed how, between June and August 2014, the

Wylie, a Canadian data analytics expert who worked with Cambridge Analytica and Kogan to devise and implement the scheme, showed a dossier of evidence about the data misuse to the *Observer* which appears to raise questions about their testimony. He has passed it to the National Crime Agency's cybercrime unit and the Information Commissioner's Office.  ***It includes emails, invoices, contracts and bank transfers that reveal more than 50 million profiles*** – mostly belonging to registered US voters – were harvested from the site in one of the largest-ever breaches of Facebook data.  Facebook on Friday said that it was also suspending Wylie from accessing the platform while it carried out its investigation, despite his role as a whistleblower

\*     \*     \*

The evidence Wylie supplied to UK and US authorities includes a letter from Facebook's own lawyers sent ***to him in August 2016***, asking him to destroy any data he held that had been collected by GSR, the company set up by Kogan to harvest the profiles.

That legal letter was sent several months after the *Guardian* first reported the breach and days before it was officially announced that Bannon was taking over as campaign manager for Trump and bringing Cambridge Analytica with him.

"Because this data was obtained and used without permission, and because GSR was not authorized to share or sell it to you, it cannot be used legitimately in the future and must be deleted immediately," the letter said.

Facebook did not pursue a response when the letter initially went unanswered for weeks because Wylie was travelling, nor did it follow up with forensic checks on his computers or storage, he said.

"That to me was the most astonishing thing.  They waited two years and did ***absolutely nothing to check that the data was deleted.  All they asked me to do was tick a box on a form and post it back.***"

Paul-Olivier Dehaye, a data protection specialist, who spearheaded the investigative efforts into the tech giant, said: "***Facebook has denied and denied and denied this. It has misled MPs and congressional investigators and it's failed in its duties to respect the law***.

"It has a legal obligation to inform regulators and individuals about this data breach, and it hasn't.  ***It's failed time and time again to be open and transparent***."

\*     \*     \*

Facebook said it removed the app in 2015 and required certification from everyone with copies that the data had been destroyed, ***although the letter to Wylie did not arrive until the second half of 2016.***

profiles of more than 50 million Facebook users had been harvested. Most damning of all, he had a letter from Facebook's own lawyers admitting that Cambridge Analytica had acquired the data illegitimately.  Going public involves an enormous amount of risk.  Wylie is breaking a non-disclosure agreement and risks being sued.  He is breaking the confidence of Steve Bannon and Robert Mercer."

86.     According to *The Guardian*, not only had Facebook shared the private information of its users without their consent, it had also helped Cambridge Analytica deceive the Parliament of the United Kingdom concerning that sharing:

> Documents seen by the *Observer*, and confirmed by a Facebook statement, show that by late 2015 the company had found out that information had been harvested on an unprecedented scale.  However, ***at the time it failed to alert users and took only limited steps to recover and secure the private information of more than 50 million individuals***.
>
> *     *     *
>
> Last month both Facebook and the CEO of Cambridge Analytica, Alexander Nix, told a parliamentary inquiry on fake news: ***that the company did not have or use private Facebook data***.
>
> Simon Milner, Facebook's UK policy director, when asked if Cambridge Analytica had Facebook data, told MPs: "***They may have lots of data but it will not be Facebook user data***.  It may be data about people who are on Facebook that they have gathered themselves, ***but it is not data that we have provided***."

87.     On March 17, 2018, one of the journalists who wrote the *Guardian* article tweeted a link to the article along with the message: "Yesterday @facebook threatened to sue us.  Today we publish this. Meet the whistleblower blowing the lid off Facebook & Cambridge Analytica."[10]

88.     Also on March 17, 2018, *The New York Times* published its article detailing the conclusions of its investigation, in conjunction with *The Observer/Guardian*, of Cambridge Analytica.  According to the article, the conclusion that Facebook had suffered one of the largest data breaches in its history was based on extensive research:

> [Cambridge Analytica] ***harvested private information from the Facebook profiles of more than 50 million users without their permission, according to former Cambridge employees, associates and documents, making it one of the largest data leaks in the social network's history***.  The breach allowed the company to exploit the private social media activity of a huge swath of the American electorate, developing techniques that underpinned its work on President Trump's campaign in 2016.
>
> An examination by The New York Times and The Observer of London reveals how Cambridge Analytica's drive to bring to market a potentially powerful new weapon put the firm – and wealthy conservative investors seeking to reshape

---

[10]  *See* https://twitter.com/carolecadwalla/status/974995682124804099; *see also* https://twitter.com/carolecadwalla/status/976875625746194433?s=03 ("Dear Mark Zuckerberg, you offered interviews to lots of outlets but not the @guardian & Observer. We broke the story first in 2015.  We led the reporting last weekend.  You used legal threats to try and stop us.  And now, you're. . . ignoring us? #WheresZuck").

politics – under scrutiny from investigators and lawmakers on both sides of the Atlantic.

\*      \*      \*

*During a week of inquiries from The Times*, Facebook **downplayed** the scope of the leak and questioned whether any of the data still remained out of its control.  But on Friday, the company posted a statement expressing alarm and promising to take action.

89.    The *New York Times* article also described how Facebook had effectively concealed until this point the sharing of users' data and that most of the data was still in Cambridge Analytica's possession, Facebook's false denials not withstanding:

Details of Cambridge's acquisition and use of Facebook data have surfaced in several accounts since the business began working on the 2016 campaign, setting off a furious debate about the merits of the firm's so-called psychographic modeling techniques.

*But the full scale of the data leak involving Americans has not been previously disclosed – and Facebook, until now, has not acknowledged it*. Interviews with a half-dozen former employees and contractors, and a review of the firm's emails and documents, have revealed that Cambridge not only relied on the private Facebook data but *still possesses most or all of the trove*.

\*      \*      \*

The data Cambridge collected from profiles, a portion of which was viewed by The Times, included details on users' identities, friend networks and "likes."  *Only a tiny fraction of the users had agreed to release their information to a third party*.

\*      \*      \*

Mr. Grewal, the Facebook deputy general counsel, said in a statement that both Dr. Kogan and "SCL Group and Cambridge Analytica certified to us that they destroyed the data in question."

But copies *of the data still remain beyond Facebook's control. The Times viewed a set of raw data from the profiles Cambridge Analytica obtained*.

While Mr. Nix has told lawmakers that the company does not have Facebook data, *a former employee said that he had recently seen hundreds of gigabytes on Cambridge servers, and that the files were not encrypted*.

90.    *The New York Times* further reported that Cambridge Analytica was "effectively a shell,"[11] and likely one that was violating U.S. election laws:

---

[11]   *The Guardian* reports the same.  *See* Carole Cadwalladr, *The Cambridge Analytica Files*, Guardian (Mar. 18. 2018)  ("For all intents and purposes, SCL/Cambridge Analytica are one and the same.").

***The firm was effectively a shell***.  According to the documents and former employees, any contracts won by Cambridge, originally incorporated in Delaware, would be serviced by London-based SCL and overseen by Mr. Nix, a British citizen who held dual appointments at Cambridge Analytica and SCL. Most SCL employees and contractors were Canadian, like Mr. Wylie, or European.

But in July 2014, an American election lawyer advising the company, Laurence Levy, warned that the arrangement ***could violate laws limiting the involvement of foreign nationals in American elections***.[12]

91.    On March 17, 2018, the technology publication *WCCFTech* published an article, titled "50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters," which explained that Facebook's business model was in trouble and that the Company's response, rather than reassuring users, was likely to make things worse:

[T]he story here isn't how this data was used.  After all [Cambridge Analytica] was paid by its backers to do exactly what it did. The problem here is how Facebook, the biggest social network, ***chose to stay silent and not inform the affected users***. . . .

The biggest revelation isn't *how* this data was used to influence voters and polarize debates on hot topics, ***the problem is Facebook's silence on the matter until it was pushed by the whistleblower who made the details public***.  While Uber and Equifax have attracted much of the user anger over delayed data breaches, ***Facebook appears to have done worse***.

The company ***by its own admission first learned about its users' data being harvested by analytics firm without user authorization back in 2015***.  In its press release, Facebook blamed everything on how it was lied to by a researcher and takes no charge of its policies that allowed such behavior or ***says anything about why the affected users weren't informed***.

\*          \*          \*

Whether the data was used or not won't answer the concerns raised over Facebook's silence on the matter at the time.

\*          \*          \*

***50 million users had no idea for nearly 3 years that they were victims of a data breach. What Facebook did (more like, did not do) appears no less than a crime***.

If Facebook had at the time informed the 50 million affected users that their data was "stolen" by a political data firm and could be used to influence their voting

---

[12]    Also on March 17, 2018, a journalist for *The New York Times* tweeted the following: "Just to be clear, the NYT and Guardian has been talking to Facebook for days about the Cambridge Analytica story.  Then they went and released that announcement to get ahead of the stories they knew were coming down the pipeline."

1    choices, the company could have potentially avoided the entire "fake news/cultural

2    warfare/voters manipulated" saga that has ensued the 2016 US presidential election.

3    (Emphasis added and in original.)

4        92.    *The Washington Post*, in a March 18, 2018 article titled "Facebook may have violated

5    FTC privacy deal, say former federal officials, triggering risk of massive fines," explained that the

6    Company faced trillions of dollars in exposure for violating a consent decree:

7            [David] Vladeck, [formerly the director of the FTC's Bureau of Consumer
         Protection oversaw the investigation of alleged privacy violations by Facebook and
8            the subsequent consent decree resolving the case in 2011, and] now a professor at
         Georgetown Law, said violations of the consent decree could carry a penalty of
9            $40,000 per violation, meaning that if news reports that the data of 50 million people
         were shared proves true, ***the company's possible exposure runs into the trillions of
10           dollars***.

11                                    *       *       *

12           Jessica Rich, who was then the deputy director for the Bureau of Consumer
         Protection and oversaw the FTC's privacy program [and] led the investigation into
13           Facebook before the 2011 consent decree [stated:] "***Facebook can look forward to
         multiple investigations and potentially a whole lot of liability here***."

14       93.    *The New York Times,* on March 18, 2018, reported that U.S. Senator Mark Warner

15   and U.S. Representative Adam Schiff had called for investigations of the Facebook data leak, while

16   U.S. Senator Amy Klobuchar of Minnesota was pressing Zuckerberg to appear before the Senate

17   Judiciary Committee to explain what the social network knew about the misuse of its data "to target

18   political advertising and manipulate voters."  Similarly, Damian Collins, a Conservative lawmaker in

19   Britain who is leading a parliamentary inquiry into fake news and Russian meddling in the country's

20   referendum to leave the European Union, said that he, too, would call on Zuckerberg or another top

21   executive to testify.  Attorney General of Massachusetts Maura Healey also announced that

22   Massachusetts had launched an investigation, while California Attorney General Xavier Becerra

23   expressed his concern (while refusing to confirm or deny the existence of an investigation, per

24   California DOJ policy).

25       94.    On Sunday, March 18, 2018, Wylie tweeted that he had been "***Suspended by

26   @facebook.  For blowing the whistle.  On something they have known privately for 2 years***."

27       95.    One *Seeking Alpha* analyst, in a March 19, 2018 article titled "The Cambridge

28   Analytica Mishap Is Serious For Facebook," concluded that the disclosures did not just raise

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 34 -

1    concerns about possible FTC fines or other investigations, but also about whether the viability of

2    Facebook's entire business model was now in doubt:

> The importance of this incident cannot be overstated for Facebook on both the user privacy front **but also more importantly on Facebook's business model front**.

> From a user privacy standpoint, undoubtedly users feel comfortable that firstly their information was apparently distributed **without their consent and seemingly without their notification**.

> Secondly, undoubtedly even more users feel violated as their information was collected by the app through being connected to users using the app, **even though they themselves never explicitly consented**.

> However the greater worry for Facebook is over control of its data. Facebook currently derives about all of its revenue from advertising, in which advertisers not only choose the platform for its sheer traffic but also because of the extremely detailed data that Facebook is constantly collecting about its billions of users.

> *       *       *

> And that is where Cambridge Analytica's real damage comes in.

> If Cambridge Analytica was able to acquire information on tens of millions of Facebook users so quickly and easily, and then keep the information for years without Facebook suspecting otherwise, then that shows a serious flaw in Facebook's ability to keep exclusive control over its information.

16    96.    *CNN*, also on March 19, 2018, concluded that "Facebook is facing an existential

17    crisis." As *CNN* explained, citing internal sources, "The Cambridge Analytica scandal has done

18    immense damage to the brand, sources across the company believe. It will now take a Herculean

19    effort to restore public trust in Facebook's commitment to privacy and data protection, they said."

20    And according to *CNN*, it is actually worse for defendants that there was no data breach (at least in a

21    technical sense):

> The scandal also highlights a problem that is built into the company's DNA: Its business is data exploitation. Facebook makes money by, among other things, harvesting your data and selling it to app developers and advertisers. Preventing those buyers from passing that data to third parties with ulterior motives may ultimately be impossible.

> Indeed, **the most alarming aspect of Cambridge Analytica's "breach" is that it wasn't a breach at all**. It happened almost entirely above board and in line with Facebook policy.

> *       *       *

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                            - 35 -

In a statement, Facebook deputy general counsel Paul Grewal said "protecting people's information is at the heart of everything we do." *That may be a hard argument for the public to accept given that Facebook's business is providing people's information to outside parties whose ultimate goals are unknowable.*

\*        \*        \*

No one has provided an adequate explanation for *why Facebook did not disclose* Kogan's violation to the more than 50 million users who were affected *when the company first learned about it in 2015*.

97.    Another article published on March 19, 2018, this one by *WCCFTech*, reported that Facebook faced billions or even trillions of dollars in liability for violating its previous consent decree with the FTC, and that "The FTC consent decree required Facebook to notify users and explicitly receive their permission before data is shared beyond their privacy settings.  In this case, the developer only received permission from those who took the test, not their friends.  *Facebook first learned of this incident back in 2015, however, chose not to inform the agency or the affected users*."

98.    Thereafter the news only got worse.  *Business Insider*, for example, published an article on March 19, 2018 titled "#DeleteFacebook is trending: Here's how to delete your Facebook account."  *Business Insider* reported:

The hashtag #DeleteFacebook is trending on Twitter.

*People are furious, and they have good reason to be*: Data from over 50 million Facebook users was used to target voters and influence the 2016 US presidential election, as well as the 2016 "Brexit" referendum, reports revealed over the weekend.

*As a result, people are deleting their Facebook accounts en masse*.

99.    Also on March 19, 2018, *The New York Times* published an article, titled "Facebook Exit Hints at Dissent on Handling of Russian Trolls," that reported defendants had decided sometime before or during December 2017 (and possibly much earlier) to force Alex Stamos, the Company's Chief Information Security Officer, out of his job at Facebook as a result of "internal disagreements over how the social network should deal with its role in spreading disinformation."[13]  According to the article, which was purportedly based on the insider accounts of seven current and former Facebook

---

[13]    *See* https://twitter.com/nytimes/status/975960641684025344.

1    employees,[14] Stamos was being forced out quietly while defendants dramatically shrunk their

2    information security team.

3        100.    On Monday, March 19, 2018, as the investing public digested the disclosures over the

4    weekend, the price of Facebook common stock plummeted, closing down more than $12 per share,

5    or nearly 7%, from its close of $185.09 per share on Friday, March 16, 2018, to close at $172.56 per

6    share on Monday, March 19, 2018, on unusually high volume of more than 88 million shares traded.

7        101.    On March 20, 2018, *The New York Times* published a follow-up article on Stamos,

8    titled "The End for Facebook's Security Evangelist," which stated:

9            After a breach of the Democratic National Committee in June 2016, Mr.
            Stamos pulled together a team to investigate Russian interference on Facebook. The
10           findings pit him against executives in the company's legal and communications
            groups. While Mr. Stamos argued to disclose more, others said that by proactively
11           disclosing what they had found, Facebook had become a target for further public ire,
            according to seven current and former Facebook employees.

12       102.    On March 20, 2018, Brian Acton, co-founder of WhatsApp, a $19 billion Facebook

13   acquisition, joined the chorus, tweeting "It is time. #deletefacebook."[15]  And on the same day, as

14   reported by *CNN*, "venture capitalist Roger McNamee, a Facebook investor and former mentor to

15   CEO Mark Zuckerberg, said the social network is facing a crisis of public trust 'that is going to

16   destroy the company.'"

17       103.    Also on March 20, 2018, news publications widely reported that the FTC had opened

18   an investigation into Facebook. According to one such article by *The Washington Post*, titled "FTC

19   opens investigation into Facebook after Cambridge Analytica scrapes millions of users' personal

20   information," the issue "at the heart of the FTC probe" is Facebook's noncompliance with the

21   consent decree.  In particular, according to *The Washington Post*'s sources, the FTC was

22   investigating whether defendants violated the provision requiring Facebook to "notify users and

23   obtain their permission before data about them is shared beyond the privacy settings they have

24   established."

25

26

27   [14]   *See* https://twitter.com/sheeraf/status/975899199903444993.

28   [15]   *See* https://twitter.com/brianacton/status/976231995846963201.

1      104.    On March 20, 2018, *Bloomberg* also published an article on the fallout, reporting that

2  "New York State Attorney General Eric Schneiderman announced on Tuesday that he and

3  Massachusetts Attorney General Maura Healey had sent a demand letter to Facebook as part of a

4  joint probe stemming from the fallout. Connecticut Attorney General George Jepsen announced his

5  own probe Monday."  The article also reported that more congresspersons had expressed interest in

6  investigating Facebook.

7      105.    The continuing bad news for Facebook on March 20, 2018 was best summed up by

8  the online publisher of technology industry news, *TechCrunch*, which described in an article the

9  same day the market's – and Congress's – further reaction to the revelations and defendants' failure

10  to adequately address them:

11          The bad thing about making your face synonymous with the company you
           run: When you go M.I.A., everyone tends to notice.

12
13          The callout posts began over the weekend. Normal Facebook users don't
           always track the tech press outrage cycle, *a flurry of reporting on Facebook's*
14          *mishandling of the private data of 50 million users, and Facebook's subsequent*
           *mishandling of that mishandling – this after* <u>everything</u> *else – it seemed to stick in*
           *their craw.*

15
16          *Worse yet for Facebook, lawmakers that they'd already pissed off were*
           *happy to circle back for a second round after the company weaseled out of the first*
17          *one*.  By Monday, a few angry, constituent-rousing tweets had snowballed into the
           kind of itemized list of questions that comes with a due date.

18          *Congress is mad*.    And it might be as mad about this poorly
19          handled Cambridge Analytica debacle as it is about getting stood up the last time
           around.  Without any kind of public statement from one of the faces of the company,
20          Facebook users are starting to feel stood up too.

21                              *          *          *

22          *Facebook alone in the hot seat*

23          This time around, Facebook might not clamber out of the hot water so easily.
           While the company had ample cover last time thanks to Google and Twitter's twin
24          implications in the controversy over Russian-bought political ads targeting U.S.
           voters, *this time Facebook stands alone.  The revelation that Facebook data on as*
25          *many as 50 million users appears to have made its way into a political data*
           *operation with no consent from users is Facebook's burden to bear alone*.

26  (Emphasis added and in original.)

27      106.    *The Guardian* also published an update to their previous story on March 20, 2018,

28  titled "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine."  The

1   article revealed new details obtained from a different whistleblower, this time a former Facebook

2   employee, about how many Facebook's users' data may have been shared without their consent and

3   when defendants knew about it.  As described by *The Guardian*:

4              ***Hundreds of millions of Facebook users*** are likely to have had their private
           information harvested by companies that exploited the same terms as the firm that
5           collected data and passed it on to Cambridge Analytica, according to a new
           whistleblower.
6
7           Sandy Parakilas, the platform operations manager at Facebook responsible for
           policing data breaches by third-party software developers between 2011 and 2012,
8           told the Guardian ***he warned senior executives at the company that its lax approach***
           ***to data protection risked a major breach***.

9           "My concerns were that all of the data that left Facebook servers to
           developers could not be monitored by Facebook, so ***we had no idea what developers***
10          ***were doing with the data***," he said.

11          Parakilas said Facebook had terms of service and settings that "people didn't
           read or understand" and ***the company did not use its enforcement mechanisms,***
12          ***including audits of external developers, to ensure data was not being misused***.

13          Parakilas, whose job was to investigate data breaches by developers similar to
           the one later suspected of Global Science Research, which harvested tens of millions
14          of Facebook profiles and provided the data to Cambridge Analytica, said the slew of
           recent disclosures had left him disappointed with his superiors for not heeding his
15          warnings.

16          "It has been painful watching," he said, "because ***I know that they could***
           ***have prevented it***."
17
18          Asked what kind of control Facebook had over the data given to outside
           developers, he replied: "***Zero***.  ***Absolutely none***.  Once the data left Facebook servers
19          there was not any control, and there was no insight into what was going on."

20          Parakilas said he "always assumed there was something of a black market"
           for Facebook data that had been passed to external developers.  However, he said that
21          ***when he told other executives the company should proactively "audit developers***
           ***directly and see what's going on with the data" he was discouraged from the***
22          ***approach***.

23          ***He said one Facebook executive advised him against looking too deeply at***
           ***how the data was being used, warning him***: "Do you really want to see what you'll
24          find?" Parakilas said he interpreted the comment to mean that "***Facebook was in a***
           ***stronger legal position if it didn't know about the abuse that was happening***".

25          He added: "***They felt that it was better not to know***.  I found that utterly
           shocking and horrifying."
26
                                   *       *       *
27
28          "It was well understood in the company that that presented a risk," he said.
           "Facebook was giving data of people who had not authorized the app themselves,

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 39 -

and was relying on terms of service and settings that people didn't read or understand."

*       *       *

Frustrated at the lack of action, Parakilas left Facebook in late 2012. "I didn't feel that the company treated my concerns seriously. I didn't speak out publicly for years out of self-interest, to be frank."

That changed, Parakilas said, when he heard the congressional testimony given by Facebook lawyers to Senate and House investigators in late 2017 about Russia's attempt to sway the presidential election. *"They treated it like a PR exercise," he said. "They seemed to be entirely focused on limiting their liability and exposure rather than helping the country address a national security issue*."

107.    On March 20, 2018, *MarketWatch* published an article titled "Zuckerberg saved tens of millions of dollars by selling Facebook stock ahead of Monday's decline." As the article explained:

Facebook Inc. Chief Executive Mark Zuckerberg saw his net worth decline by more than $5 billion since Monday, but it could have been worse.

Ahead of Facebook's worst one-day decline since 2012, prompted by news that data affecting 51.3 million members was improperly shared with a political consulting firm, Zuckerberg had been busy selling stock. So far this year, he has sold more than 5 million shares.

Disposing of those Facebook shares before Tuesday ended up saving about $70 million, according to Securities and Exchange Commission filings and some arithmetic by MarketWatch.

108.    On these further revelations, the price of Facebook common stock continued to decline, closing down more than $4 per share, from its close of $172.56 per share on March 19, 2018 to close at $168.15 per share on March 20, 2018, on unusually high volume of more than 129 million shares traded.

109.    On March 21, 2018, defendants were forced to respond directly to what *Wired* described as "four days[ of] Facebook . . . be[ing] taken to the woodshed by critics, the stock market, and regulators after it was reported that the data-science firm Cambridge Analytica obtained the data of 50 million Facebook users," during which time "Mark Zuckerberg had stayed silent." Defendants broke this silence by having Zuckerberg make a number of statements and giving interviews conceding that *The Observer/Guardian* and *The New York Times* reporting was credible, and that

1   Facebook had known that the data of millions of its users had been shared without their consent, and

2   had done nothing.

3          110.    Zuckerberg made the first of his March 21, 2018 statements in a post to his personal

4   Facebook page.  In the post, he took "responsibl[ity] for what happens on our platform" and

5   reaffirmed that "[w]e have a responsibility to protect your data, and if we can't then we don't

6   deserve to serve you."  He also admitted that defendants "made mistakes," and that the Cambridge

7   Analytica issue reflected "a breach of trust between Facebook and the people who share their data

8   with us and expect us to protect it. We need to fix that."  But Zuckerberg also deflected criticism,

9   writing that, "***In this case***, we already took the most important steps a few years ago in 2014 to

10  prevent bad actors from accessing people's information ***in this way***," leaving open the possibility

11  that in other cases, or in other ways, Facebook may not have taken even the scant actions they took

12  in the Cambridge Analytica matter.

13         111.    On March 21, 2018, Sandberg shared Zuckerberg's Facebook post and added her own

14  statements on her Facebook page, stating in part: "We know that this was a major violation of

15  people's trust, and I deeply regret that we didn't do enough to deal with it. We have a responsibility

16  to protect your data."

17         112.    On March 21, 2018, Zuckerberg gave an interview to *Wired* to discuss "Facebook's

18  privacy problem."  In the interview, Zuckerberg disclosed, *inter alia*, that Cambridge Analytica was

19  not the only third party Kogan had shared "a lot" of users' data with, that Facebook might have to do

20  a "full forensic audit" of every one of its developers operating before Facebook changed its policies,

21  and conceded that *The Observer/Guardian* and *The New York Times* reporting was credible:[16]

> [Wired:]  You learned about the Cambridge Analytica breach in late 2015,
> and you got them to sign a legal document saying the Facebook data they had
> misappropriated had been deleted. ***But in the two years since, there were all kinds***
> ***of stories in the press that could have made one doubt and mistrust them. Why***
> ***didn't you dig deeper to see if they had misused Facebook data***?
>
> [Zuckerberg]**:** So in 2015, when we heard from journalists at *The Guardian*
> that Aleksandr Kogan seemed to have shared data with Cambridge Analytica ***and a***
> ***few other parties***, the immediate actions that we took were to ban Kogan's app and
> to demand a legal certification from Kogan and all the other folks who he shared it

---
[16]   He did not address Facebook's threats to sue those same media outlets over their reporting.

with.  We got those certifications, and Cambridge Analytica had actually told us that they actually hadn't received raw Facebook data at all.  It was some kind of derivative data, but they had deleted it and weren't [making] any use of it.

In retrospect, though, I think that what you're pointing out here is *one of the biggest mistakes that we made*.  And that's why the first action that we now need to go take is to not just rely on certifications that we've gotten from developers, *but [we] actually need to go and do a full investigation of every single app that was operating before we had the more restrictive platform policies* – that had access to *a lot of data* – and for any app that has any suspicious activity, we're going to go in and do a *full forensic audit*.  And any developer who won't sign up for that we're going to kick off the platform.  So, yes, I think the short answer to this is that's the step that I think we should have done for Cambridge Analytica, and we're now going to go *do it for every developer who is on the platform who had access to a large amount of data* before we locked things down in 2014.

\* \* \*

[Zuckerberg:]   [W]e want to *make sure that there aren't other Cambridge Analyticas out there*. . . .  So I think our responsibility is to now go and look at every single app and to, any time there's anything suspicious, get into more detail and do a full audit of them. . . .

. . . [Wired:]  How confident are you that Facebook data didn't get into the hands of Russian operatives – into the Internet Research Agency, *or even into other groups that we may not have found yet*?

[Zuckerberg:]  I can't really say that.  I hope that we will know that more certainly *after we do an audit.*  You know, for what it's worth on this, the report in 2015 was that Kogan had shared data with Cambridge Analytica *and others*.  When we demanded the certification from Cambridge Analytica, what they came back with was saying:  *Actually, we never actually received raw Facebook data.  We got maybe some personality scores or some derivative data from Kogan, but actually that wasn't useful in any of the models, so we'd already deleted it and weren't using it in anything.  So yes, we'll basically confirm that we'll fully expunge it all and be done with this.*

So I'm not actually sure where this is going to go.  I certainly think the *New York Times* and *Guardian* and Channel 4 reports that we received last week suggested that Cambridge Analytica still had access to the data.  *I mean, those sounded credible enough that we needed to take major action based on it*.

\* \* \*

I think that we have a serious responsibility.  I want to make sure that we take it as seriously as it should be taken.  *I'm grateful for the feedback that we get from journalists* who criticize us and teach us important things about what we need to do, because we need to get this right.  It's important.  There's no way that sitting in a dorm in 2004 you're going to solve everything upfront.  It's an inherently iterative process, so I don't tend to look at these things as: Oh, I wish we had not made that mistake.  I mean, of course I wish we didn't make the mistakes, but *it wouldn't be possible to avoid the mistakes*.

113.    On March 21, 2018, Zuckerberg also gave an interview to *CNN* during which he apologized for Facebook's failure to secure users' data and further revealed that defendants had no idea how much data might still be compromised.  According to *CNN*:

> After his post on Wednesday, Zuckerberg was criticized by some on social media for stopping short of an outright apology.  He rectified that in the CNN interview.
>
> "***This was a major breach of trust***, and I'm really sorry that this happened," Zuckerberg said.  "We have a basic responsibility to protect peoples' data."
>
> *          *          *
>
> "***It's hard to know what we'll find***, but we are going to review thousands of apps," he told CNN.  "This is going to be an intensive process."
>
> *          *          *
>
> "This isn't rocket science.  Right?" he said. " And there's a lot of hard work we have to do to make it harder for nation states like Russia to do election interference," he said.  "But we can get in front of this."

114.    In addition, Zuckerberg gave an interview to *The New York Times* on March 21, 2018 in which he stated, *inter alia*, that Facebook would "tell anyone whose data may have been shared," a step defendants could presumably have taken months or years before, and that he did not know whether "there are other Cambridge Analyticas out there," such that Facebook would have to investigate thousands of apps.

115.    On March 21, 2018, Zuckerberg was also interviewed by *Recode*.  During the interview he disclosed that Facebook needed to investigate not thousands, but tens of thousands, of apps that may have improperly shared data.  He also conceded that he did not know how much data had been impermissibly sold to third parties, that defendants might not even be able to determine what had been improperly sold to or shared with and by third parties, and that the entire issue was "a pretty big deal," with significant costs for Facebook:

> [Recode:]  [D]id you think, "Well, we need to actually go out and check to make sure that [Cambridge Analytica is] telling us the truth."  Why didn't you do this kind of stuff earlier, or did you think about doing this earlier?
>
> [Zuckerberg:]  In retrospect, it was clearly a mistake.  Right?  The basic chronology here is in 2015, a journalist from the Guardian pointed out to us that it seemed like the developer Aleksandr Kogan and shared sold data to Cambridge Analytica ***and a few other firms***. . . .

1    So, given that, that [Cambridge Analytica] said that they never had the data
2    and deleted what derivative data that they had, at the time it didn't seem like we
      needed to go further on that. But look, in retrospect it was clearly a mistake. I'm
3    explaining to you the situation at the time, and the actions that we took, but I'm not
      trying to say it was the right thing to do. I think given what we know now, we
4    clearly should have followed up, and we're never going to make that mistake again.

5    I think we let the community down, and I feel really bad and I'm sorry about
      that. So, that's why we're going to go and do these broad audits.

6    [Recode:] All right, when you think about that idea of . . . it's not exactly a
7    "mistakes were made" kind of argument, but you are kind of making that . . . the
      horses are out of the barn door. Can you actually go get that data from them? Are
8    you . . . It's everywhere, I would assume. I've been told by many, many people that
      have access to your data, I was thinking of companies like RockYou and all kinds of
9    things from a million years ago that have a lot of your data . . . Can you actually get
      it back? I don't think you can. I can't imagine you can.

10   [Zuckerberg:] Not always. But **the goal isn't to get the data back** from
      RockYou. You know, people gave their data to RockYou. So RockYou **has the**
11   **right to have the data**. What RockYou does not have the right to do is share the data
      or sell it to someone without people's consent. And part of the audits and what we're
12   going to do is see whether those business practices were in place, and if so we can
      kind of follow that trail and make sure that developers who might be downstream of
13   that comply or they're going to get banned from our platform overall.

14                          *        *        *

15   [Recode:] Mark, can you give us a sense of the timing and cost for this?
      Like, the audits that you're talking about. Is there any sense of how quickly you
16   could do it and what kind of cost it would be to the company?

17   [Zuckerberg:] I think it depends on what we find. But we're going to be
      **investigating and reviewing tens of thousands of apps** from before 2014, and
18   assuming that there's some suspicious activity we're probably going to be doing a
      number of formal audits, so I think **this is going to be pretty expensive**. You know,
19   the conversations we have been having internally on this is, "Are there enough
      people who are trained auditors in the world to do the number of audits that we're
20   going to need quickly?" But, I think **this is going to cost many millions of dollars**
      and take a number of months and hopefully not longer than that in order to get this
21   fully complete.

22   [Recode:] Okay, last question Mark, and then you can go. How badly do you
      think Facebook has been hurt by this, and you yourself, the reputation of Facebook?
23

24   [Zuckerberg:] I think **it's been a pretty big deal**. The No. 1 thing that people
      care about is privacy and the handling of their data. You know, if you think about it,
25   the most fundamental thing that our services are, whether it's Facebook or Whatsapp
      or Instagram, is this question of, "Can I put content into it?" Right? Whether it's a
26   photo, or a video or a text message. And will that go to the people I want to send it
      to and only those people? And, whenever there is a breach of that, that undermines
27   the fundamental point of these services. So I think **it's a pretty big deal**, and that's
      why we're trying to make sure we fully understand what's going on, and make sure
28   that this doesn't happen again. I'm sure there will be different mistakes in the future,
      but let's not make this one again.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 44 -

116.    Recode was apparently unimpressed with Zuckerberg's responses, writing on March 21, 2018, about the interview:

> But Zuckerberg did not give any details about **why the company did not do those checks, or about why broader monitoring of third-party developers – who in some cases were given vast troves of user information – was so shoddy**.

> He said Facebook is now trying to go back and check who has user data, although it's essentially an effort to put the genie back into the bottle. When asked if he could recover some of the data now, Zuckerberg admitted, "**not always**."

117.    Then on Monday, March 26, 2018, the FTC issued a press release confirming that it was investigating Facebook's privacy practices and compliance with the consent decree:

> "The FTC is firmly and fully committed to using all of its tools to protect the privacy of consumers. Foremost among these tools is enforcement action against companies that fail to honor their privacy promises, including to comply with Privacy Shield, or that engage in unfair acts that cause substantial injury to consumers in violation of the FTC Act. Companies who have settled previous FTC actions must also comply with FTC order provisions imposing privacy and data security requirements. Accordingly, the FTC takes very seriously recent press reports raising substantial concerns about the privacy practices of Facebook. Today, the FTC is confirming that it has an open non-public investigation into these practices."

118.    In addition, *USA Today* published an article on March 26, 2018, titled "Facebook's FTC probe rocked the stock. But will anything rein in Facebook?," which reported that "Facebook's stock took a beating Monday after the Federal Trade Commission said it was investigating." According to the article, which relied on a former chairman and a former general counsel of the FTC, it is "'almost certain'" that Facebook violated the law or the consent decree and that the FTC would take punitive action as a result:

> **The FTC's $40,000-a-day baton**

> Facebook and regulators have squared off before, and that's the subject of the FTC probe. The agency said it's investigating whether Facebook violated a 2011 consent decree to protect users' privacy. The decree requires Facebook to notify users and get explicit permission before sharing their personal information beyond the limits in their privacy settings. Each violation of the agreement would cost Facebook up to $40,000 a day.

> "There's some fairly strong commitments built into the settlement," William Kovacic, a professor of law at George Washington University and a former member of the Federal Trade Commission, which he chaired from March 2008 to March 2009. "The critical question is looking in detail at what happened here, did Facebook abide by it."

> The FTC could also consider whether Facebook acted deceptively in the situation, which could lead to outside monitors and regular compliance checks of

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 45 -

data security, says Stephen Calkins, a professor of law at Wayne State University who served as the FTC's general counsel from 1995 to 1997.

Since Facebook executives have already apologized for wrongdoing, "*it's almost certain that they violated something enforced by the FTC and it's almost certain there will be a remedy imposed*," Calkins said.

*        *        *

Another lawmaker, Sen. Richard Blumenthal (D-Conn.), asked the FTC to explore whether Facebook should pay damages to users. "The sphere of scrutiny must be broader than just the consent decree," he said in a statement. "There is no excuse for delay."

119.    The same March 26, 2018 *USA Today* article also reported that "[i]t's officially open season on Facebook," not just because the FTC was investigating, but also because an increasing number of users, investors, CEOs, regulators, lawmakers and even advertisers were all contributing to an "unprecedented backlash" against the Company:

Angry users and money-losing investors. Regulators in the U.S. and Europe. State attorneys general and lawmakers — they all say the social media giant should be held to account for the misuse of personal information of as many as 50 million Facebook users by data analysis firm Cambridge Analytica, which said it helped Donald Trump get elected.

*The chances of a sweeping regulatory backlash — the kind Facebook has been able to skirt in the past — have never been higher*. Even greater is the risk to Facebook in the court of public opinion.

"If I were Facebook, I would be quite nervous about popular sentiment," University of Washington law professor Ryan Calo said.

*Facebook's stock took a beating Monday after the Federal Trade Commission said was it was investigating and the attorneys general for 37 U.S. states and territories sought details on how Facebook monitored what app developers did with user data and whether Facebook had sufficient safeguards to keep it from being misused*. On Capitol Hill, lawmakers turned up the volume on calls for Facebook CEO Mark Zuckerberg to testify.

The CEOs of some large tech companies who have tried to cast themselves as more responsible when it comes to treatment of customers' data, piled on, too.

*        *        *

For years, Facebook has skated with few consequences when it has angered users over how it handles their data. Congress and regulatory agencies have largely resisted calls to crack down on the Silicon Valley company, which now has more than 2 billion users around the globe.

But it faces an unprecedented backlash after reports in the *New York Times* and *The Observer* that political ad consultancy Cambridge Analytica improperly

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                            - 46 -

received data on tens of millions of Facebook users who downloaded an unrelated psychology app, and data on those users' friends, without their consent.

*Some brands, such as Pep Boys and Sonos, have pulled their ads from Facebook. Tesla and SpaceX CEO Elon Musk said he would delete his firms' Facebook pages. Shares (FB), which fell 6% after the FTC probe announcement but then recovered by the close, are flirting with bear-market territory.*

\*          \*          \*

*By far the greatest danger to Facebook's social media empire would be losing what really matters: the trust and the time of its users. The Cambridge Analytica crisis appears to be taking a toll on how people feel about Facebook.*

Only one in four (41%) of Americans trust Facebook to obey laws that protect their personal information, according to a Reuters Ipsos poll released Sunday. In comparison, Amazon is trusted by 66%, Google (62%), Microsoft 60%) and Yahoo (40%), which reported a pair of massive breaches in 2016.

120.   In reaction to this news, Facebook's stock price fell as much as 6.5% to $149.02 per share before closing at $160.06 per share, on unusually high volume of more than 122 million shares traded.

**LOSS CAUSATION/ECONOMIC LOSS**

121.   During the Class Period, defendants made false and misleading statements about Facebook's business and operations and engaged in a scheme to deceive the market.  Defendants' conduct artificially inflated the price of Facebook common stock and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations were disclosed to market participants, the price of Facebook common stock dropped, as the prior artificial inflation came out of the price. As a result of their purchases of Facebook common stock during the Class Period, plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

122.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

1        (d)     The misrepresentations alleged would tend to induce a reasonable investor to

2  misjudge the value of the Company's stock; and

3        (e)     Plaintiff and other members of the Class purchased Facebook common stock

4  between the time defendants misrepresented or failed to disclose material facts and the time the true

5  facts were disclosed, without knowledge of the misrepresented or omitted facts.

6        123.    At all relevant times, the market for Facebook stock was efficient for the following

7  reasons, among others:

8        (a)     Facebook stock met the requirements for listing and was listed and actively

9  traded on the NASDAQ, an efficient market;

10        (b)     As a regulated issuer, Facebook filed periodic public reports with the SEC;

11  and

12        (c)     Facebook regularly communicated with public investors via established

13  market communication mechanisms, including through the regular dissemination of press releases on

14  major news wire services and through other wide-ranging public disclosures, such as

15  communications with the financial press, securities analysts and other similar reporting services.

16                                **NO SAFE HARBOR**

17        124.    Many (if not all) of defendants' false and misleading statements during the Class

18  Period were not forward-looking statements ("FLS") and/or were not identified as such by

19  defendants, and thus did not fall within any "Safe Harbor."

20        125.    Facebook's verbal "Safe Harbor" warnings accompanying its oral FLS issued during

21  the Class Period were ineffective to shield those statements from liability.

22        126.    Defendants are also liable for any false or misleading FLS pleaded because, at the

23  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

24  authorized and/or approved by an executive officer of Facebook who knew that the FLS was false.

25                          **CLASS ACTION ALLEGATIONS**

26        127.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

27  of Civil Procedure on behalf of all persons who purchased Facebook common stock during the Class

28  Period (the "Class").  Excluded from the Class are defendants and their immediate families, directors

1    and officers of Facebook and their immediate families, and their legal representatives, heirs,

2    successors or assigns and any entity in which defendants have or had a controlling interest.

3        128.    The members of the Class are so numerous that joinder of all members is

4    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

5    the parties and the Court.  During the Class Period, Facebook had more than 2.395 billion shares of

6    common stock outstanding, owned by hundreds or thousands of persons.

7        129.    There is a well-defined community of interest in the questions of law and fact

8    involved in this case.  Questions of law and fact common to the members of the Class that

9    predominate over questions that may affect individual Class members include:

10                (a)    Whether the 1934 Act was violated by defendants;

11                (b)    Whether defendants omitted and/or misrepresented material facts;

12                (c)    Whether defendants' statements omitted material facts necessary in order to

13    make the statements made, in light of the circumstances under which they were made, not

14    misleading;

15                (d)    Whether defendants knew or recklessly disregarded that their statements were

16    false and misleading;

17                (e)    Whether the price of Facebook common stock was artificially inflated; and

18                (f)    The extent of damage sustained by Class members and the appropriate

19    measure of damages.

20        130.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

21    sustained damages from defendants' wrongful conduct.

22        131.    Plaintiff will adequately protect the interests of the Class and has retained counsel

23    who are experienced in class action securities litigation.  Plaintiff has no interest which conflicts

24    with those of the Class.

25        132.    A class action is superior to other available methods for the fair and efficient

26    adjudication of this controversy.

27

28

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

133.    Plaintiff incorporates ¶¶1-132 by reference.

134.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Facebook common stock during the Class Period.

136.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Facebook common stock.  Plaintiff and the Class would not have purchased Facebook common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

137.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Facebook common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

138.    Plaintiff incorporates ¶¶1-137 by reference.

1    139.    During the Class Period, defendants acted as controlling persons of Facebook within

2    the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public

3    statements about Facebook, the Individual Defendants had the power and ability to control the

4    actions of Facebook and its employees.  Facebook controlled the Individual Defendants and its other

5    officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the

6    1934 Act.

7                                **PRAYER FOR RELIEF**

8            WHEREFORE, plaintiff prays for judgment as follows:

9            A.    Determining that this action is a proper class action, designating plaintiff as Lead

10   Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil

11   Procedure and plaintiff's counsel as a Lead Counsel;

12           B.    Awarding plaintiff and the members of the Class damages and interest;

13           C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

14           D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

15   proper.

16                                   **JURY DEMAND**

17           Plaintiff demands a trial by jury.

18   DATED:  March 27, 2018                     ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
19                                              JASON C. DAVIS
                                                KENNETH J. BLACK
20

21

22                                              *s/ Jason C. Davis*
                                                JASON C. DAVIS

23                                              One Montgomery Street, Suite 1800
                                                San Francisco, CA  94104
24                                              Telephone:  415/288-4545
                                                415/288-4534 (fax)
25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 51 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DANIELLE S. MYERS
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\CPT Facebook.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows - **List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| FB | 2/1/18 | 500 | 194.20 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _26th_ day of _March_, 2018 in _Atlanta_, _Georgia_.

                                        City                State

(Signature) X _Ms. Bennett_
DocuSigned by:
2E8953799857478...

(Print Name) _Ernestine Bennett_
               First                Last